UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ALONZO SMITH,

    Plaintiff,

    v.

RICHARD MACK, et al.,

    Defendants.

Case No. 13-cv-00246-VC

**ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT**

Re: Docket Nos. 85, 96, 100, 113

Introduction

Alonzo Smith was a prisoner at Salinas Valley State Prison. He contends prison officials violated his Eighth Amendment rights by disregarding his need for a special diet while he was healing from a broken jaw. The defendants have moved for summary judgment. Their motions are denied.

Background

The following is a description of the evidence considered in the light most favorable to Smith:

Smith broke his jaw in a fight with another inmate. He was admitted to the prison's Clinical Treatment Center ("CTC"), where a doctor wired his jaw shut. He received a liquid diet while at CTC. Roughly five weeks after the injury, Smith began vomiting, and nurses cut the wires to prevent him from choking. Three days after that, Smith was discharged from CTC to the general prison population. An officer told Smith he was being discharged from CTC due to a shortage of bed space. The officer also told Smith he would receive the same diet in the general population as the one he received at CTC, based on his doctor's order.

But once Smith was back in the general population, he didn't receive a special diet, and he experienced extreme pain when he tried to eat food at the prison cafeteria. This was because his

1    jaw was still not healed, and because the nurses at CTC hadn't removed all the wires from his

2    mouth, instead leaving some sharp wires attached to his teeth (which caused him to bleed when he

3    ate). Furthermore, inmates only had 15-20 minutes to eat their meals at the cafeteria; Smith's pain

4    prevented him from eating so fast.

5    For months, Smith asked for help, to no avail. Initially, he went to Officer E. Canchola,

6    who served as a "medical escort officer." Smith told Canchola (based on what he was told when

7    discharged from CTC) that he needed a special diet and that there was a doctor's order for a

8    special diet. Canchola reviewed Smith's records and found an order from Dr. Fernando Tuvera

9    that Smith was to receive a "soft chopped" diet.

10   At the time, Smith did not know what a "soft chopped" diet was. Because an officer at

11   CTC told Smith he'd receive the same diet after discharge, he assumed the order from Dr. Tuvera

12   for a "soft chopped" diet was for the liquid diet he'd been getting at CTC.

13   In any event, Canchola tried to help Smith get his special diet. Canchola presented Smith's

14   primary care physician, Dr. Richard Mack, with the order. Dr. Mack responded that this was a

15   "dental problem" and that he was unable to assist.

16   Canchola then asked the nurses at the "A-Facility Clinic" for assistance. The nurses stated

17   that Smith would have to return to CTC to receive the special diet.

18   Canchola then went with Smith (and with Smith's friend, Joshua Barries) to what Smith

19   calls the "Program Office" and showed the doctor's order to the sergeant on duty. The sergeant

20   sent them to the kitchen.

21   Then the group went to the kitchen to try to arrange for Smith's special diet. Kitchen

22   staffers stated they were unable to prepare the diet.

23   Canchola then returned with Smith and his friend to the Program Office. The supervisors

24   at the office declined to assist, stating that it was a medical problem.

25   At this point, Canchola told Smith he would have to return to CTC if he wished to receive

26   a special diet. Canchola then called CTC and tried to send Smith back, but a CTC staff member

27   said that Smith could not return because there was no more bed space, and said that Smith should

28   just "do the best [he] can to eat."

1    A couple of days after Smith's discharge from CTC, Canchola brought the order to Dr.
2 Vaun Munk, a dentist at the prison. But Dr. Munk responded, "There's nothing I can do." At a
3 dental appointment a few days later, Smith showed Dr. Munk the order, said he was in extreme
4 pain and unable to chew his food, and asked for his help getting the diet he'd been prescribed. Dr.
5 Munk refused to assist, and told Smith that "the pain you have is the pain you're gonna have."
6 (Six months later, Dr. Munk finally requested a special diet for Smith, but the Chief Medical
7 Executive, Anise Adams, denied that request, explaining that "[the prison] has no soft diets on the
8 yards.")

9    Also during the first week following discharge, Smith submitted a "Health Care Services
10 Request Form" in which he complained of being in constant pain and not receiving proper meals.
11 The supervising dentist, Dr. John Adamo, reviewed the request but took no action.

12    Roughly a month following his discharge, Smith visited Dr. Joerg Wittenberg – the doctor
13 who had wired his jaw shut at CTC. At this visit, and at visits during the next several months,
14 Smith complained of extreme pain, stated he was unable to chew food, and complained he was not
15 receiving the soft food diet the doctor ordered. Dr. Wittenberg conceded to Smith that he needed a
16 special diet. But Dr. Wittenberg said he didn't have the authority to order it.

17    Smith also saw Dr. Mack (the primary care physician Smith had visited while with Officer
18 Canchola) at least two more times in the months following his discharge from CTC. Smith
19 reminded Dr. Mack that he was in pain and couldn't eat the food he was receiving in the general
20 population, but Dr. Mack didn't do anything.

21    Roughly three months after he was discharged from CTC, Smith submitted a "Health Care
22 Appeal" complaining that the doctor had ordered a "soft chopped" diet for him, he wasn't
23 receiving it, he was in constant pain, he couldn't chew properly and his jaw wasn't healing right
24 because he was overworking it trying to eat regular food. In addition to requesting the special
25 diet, Smith requested that he be "cell fed" (that is, given food in his cell rather than having to go to
26 the cafeteria). And he complained he was released from CTC with wires still in his mouth, which
27 hurt him. Mark Ellis, the Chief Executive Officer of Health Care Services at the prison, denied the
28 appeal in part and granted it in part. Although he granted Smith's request to be cell fed, he denied

3

1   the request for a special diet, stating: "There is no special dietary order for 'chopped' food at [the
2   prison], you will have to make do with what is provided to you."

3       Seventeen months after discharge from CTC, Smith was finally treated by an off-site oral
4   surgeon, Dr. Brian Woo, who recommended that Smith receive a soft, "non-chew" diet. At his
5   deposition, Dr. Woo testified that he would have recommended a non-chew diet for at least eight
6   weeks following removal of the wires.

7       Discussion

8       This case is similar to *Lopez v. Smith*, 203 F.3d 1122 (9th Cir. 2000). In *Lopez*, a doctor
9   ordered that a prisoner receive a liquid diet while healing from a broken jaw. Prison officials were
10  aware of the order but didn't give the prisoner the liquid diet. The prisoner experienced severe
11  pain as a result, and lost weight because he ultimately couldn't eat the food the prison gave him.
12  The Ninth Circuit concluded this was an Eighth Amendment violation, because the prison
13  officials' refusals to follow the doctor's order reflected a deliberate indifference to the prisoner's
14  serious medical needs. *Id*. at 1132-33. *See also Webb v. Douglas County*, 224 Fed.Appx. 647,
15  649 (9th Cir. 2007) ("[A] prison official acts with deliberate indifference when he ignores the
16  instructions of the prisoner's treating physician or surgeon."). Here, taking a view of the evidence
17  most favorable to Smith, numerous prison officials were aware that a doctor had ordered a special
18  diet for him following his discharge from CTC but made no effort to ensure that the order was
19  followed. Instead, they rested on an apparent policy that nobody in the general population was
20  allowed to receive a special diet. But a general policy like that does not give prison officials
21  license to disregard the serious medical needs of a particular prisoner. *See, e.g., Jett v. Penner*,
22  439 F.3d 1091, 1097 (9th Cir. 2006). If they really couldn't give Smith a special diet in the
23  general population (and if Smith really needed a special diet to eat without severe pain), they
24  needed to find a different place for him.

25      The only real difference between *Lopez* and this case is that in *Lopez* the doctor's order for
26  a liquid diet was apparently unambiguous (at least based on the Ninth Circuit's description of the
27  facts). Here, there was confusion about the doctor's order. An officer told Smith upon his
28  discharge from CTC that he would keep getting the same diet, and Smith had been getting a liquid

diet, so he assumed a doctor had ordered a liquid diet for him. But the order was for a "soft chopped" diet, which sounds different from a liquid diet. The defendants focus heavily on this distinction, noting that plenty of food at the prison cafeteria could be described as "soft" or "chopped" or easily broken up into small pieces. And so, they contend, the prison officials didn't actually deny Smith what his doctor ordered, even if they might have thought they were doing so when they told him that nobody in general population could have a special diet.

But the confusion about the doctor's order doesn't make this case materially different from *Lopez*. The bottom line is that: (i) Smith had a serious medical need; (ii) a special diet would have addressed that serious medical need; (iii) Smith repeatedly requested a special diet, even if he might not have understood exactly what he was requesting; (iv) a special diet was ordered by his doctor; and (v) the defendants didn't even consider complying with the doctor's order because of an apparent policy that people in the general population can't have special diets. There was ambiguity about precisely what the doctor had ordered, but the defendants were still disregarding a doctor's order in the face of complaints of extreme pain by the patient. And had they attended to Smith's complaints instead of disregarding them, presumably this would have led them to take measures responsive to Smith's serious medical need (such as returning him to CTC or giving him a liquid diet while he resided in the general population). The failure to respond to the doctor's order is deliberate indifference to a serious medical need, even if nobody drilled down to figure out the precise nature of the need.[1]

---

[1] The defendants are wrong to argue that Smith's current argument that he needed a liquid diet is different from the argument he made to prison officials during administrative proceedings for a "soft chopped diet." Viewing the evidence in a light most favorable to Smith, he assumed his doctor had ordered the same diet that he received while at CTC. And at its core, his request of the prison officials was a request to fulfill his doctor's order. This request was sufficient to put prison officials on notice of the basis for his claim during administrative proceedings. *See Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009) ("[T]he primary purpose of a grievance [is] to notify the prison of a problem."). Similarly, the defendants are wrong to argue that Smith concocted his story about thinking a "soft chopped" diet was the same one he'd gotten at CTC at the eleventh hour in a declaration responding to their summary judgment motion. Smith testified the same way at his deposition.

5

And the evidence would, if believed by the jury, support a verdict that each of the named defendants was responsible for this constitutional violation:

- Dr. Mack (Smith's primary care physician) was aware of the doctor's order for a special diet but stated he couldn't do anything because it was a mere dental problem.

- Dr. Munk (the dentist) was aware of the order but said he could not do anything because the prison had a policy of not giving special diets in the general population. It was not until six months after Smith's discharge that Dr. Munk finally requested a special diet for him (a request that was denied).

- Dr. Wittenberg (the doctor who wired Smith's jaw shut and who saw him for several follow-up visits) said he didn't have the authority to order a special diet for him in the general population.

- Adams (the Chief Medical Executive) denied the request made by Dr. Munk six months after Smith's discharge, and she did so for the sole reason that soft diets are not available to people in the general population.

- Dr. Adamo (the supervising dentist) was aware that Smith was in pain and was not receiving the special diet, but he did nothing. In his deposition, Dr. Adamo testified that he was merely following Dr. Wittenberg's discharge order. But Wittenberg's order was on the same page as Dr. Tuvera's order prescribing the soft chopped diet. And Dr. Adamo testified that he knew Smith had requested this soft food diet, because Smith submitted the Health Care Services Request Form. Yet Dr. Adamo did not take any steps to ensure Smith was given the special diet.

- Ellis (the Chief Executive Officer of Healthcare Services) was aware of the doctor's order for a special diet but denied Smith's appeal on the sole ground that people in Smith's situation were not entitled to special diets.

For similar reasons, the defendants are not entitled to qualified immunity. This is the type of qualified immunity case where a factual dispute that precludes entry of summary judgment on the underlying constitutional question also precludes a finding of qualified immunity at the summary judgment stage. *See*, *e.g.*, *Espinosa v. City and County of San Francisco*, 598 F.3d 528, 532 (9th Cir. 2010). In other words, if there was a violation at all, it was by definition a clear violation – the deliberate disregard of a doctor's order by prison officials which results in extreme

6

pain for the patient. It is beyond debate, in light of the Ninth Circuit's rulings in *Lopez*, *Webb*, and *Jett*, that this right existed, so if a jury resolves the factual disputes in Smith's favor, the defendants violated a right that was clearly established.

Conclusion

The summary judgment motions are denied. The parties are ordered to appear at a case management conference on July 7, 2015 at 10:00 a.m. An updated joint case management conference statement is due 7 days prior to the case management conference.

**IT IS SO ORDERED.**

Dated: June 19, 2015

_____
VINCE CHHABRIA
United States District Judge